Argued and submitted February 19, reversed and remanded in part; otherwise
affirmed October 8, 1997

## Gaylen BROWN,
*Appellant,*

*v.*

## BOISE-CASCADE CORPORATION,
a Delaware corporation,
*Respondent.*

(9403-02265; CA A89371)

946 P2d 324

J. Rion Bourgeois argued the cause and filed the briefs for appellant.

Thomas M. Christ argued the cause for respondent. With him on the briefs was Mitchell, Lang & Smith.

Before Deits, Chief Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Plaintiff, who suffered grievous injuries after he fell from a structure at defendant Boise Cascade Corporation's St. Helens paper mill, appeals from an adverse judgment entered after a jury trial on claims of negligence, negligence *per se*, and violation of the Employer's Liability Law (ELA), ORS 654.305 *et seq.* Plaintiff raises 22 assignments of error challenging both the trial court's refusal to submit substantial aspects of his claims to the jury, as well as rulings pertaining to those matters that were submitted to the jury. Defendant asserts, through four cross-assignments of error, that the trial court erred in denying its motions for a directed verdict as to each of plaintiff's claims. Based primarily on our disposition of the cross-assignments of error, we affirm the trial court in most respects but reverse and remand for a new trial on that portion of plaintiff's negligence *per se* claim that pertains to alleged inadequate lighting in the workplace.

Plaintiff worked as a painter for Partridge Industrial Coating (Partridge). In early April 1992, defendant contracted with Partridge to have its St. Helens paper mill painted. That painting was part of a general "sprucing up" of the mill before a tour by company executives and other mill managers.[1] On April 3, 1992, plaintiff was engaged in painting part of a very large room in the plant, called the "core room" because it contained "cores," which are the cardboard frames around which defendant wraps paper as it is produced. The core room was approximately 160 feet long, 65 feet wide, and 30 feet high. In one corner of, and inside, the core room was a smaller room, the "sample room," which was fully enclosed by walls and a roof. The sample room was 22 feet long, 11 feet wide, and nine feet high.

Partridge's foreman, Tom Tallon, directed plaintiff to paint the portion of the core room wall that was adjacent to the sample room. To perform that work, plaintiff climbed onto the sample room's roof, using a ladder. There were no railings around the sample room roof and no fall protection

---

[1] The relationship between defendant and Partridge and their respective involvements in the work plaintiff performed are described more particularly below in the discussion of plaintiff's ELA claim. 150 Or App at 397-99.

below that area. Although Partridge had provided plaintiff with a harness and a lanyard, he did not tie the lanyard to anything. As plaintiff was standing on the sample room roof and was painting the core room wall, he fell from the roof to the core room floor. Plaintiff fractured his neck and was rendered quadriplegic.

Plaintiff filed this action on March 31, 1994, alleging claims for negligence and violation of the ELA. Plaintiff asserted nine specifications of common-law negligence, including failure to provide railings, lack of fall protection, and failure to provide adequate lighting for his painting activities.[2] As part of his negligence claim, plaintiff further alleged that defendant had violated regulations promulgated under the Oregon Safe Employment Act (OSEA), and that those violations materially contributed to his injuries.[3] Plaintiff asserted, particularly, that defendant had violated regulations that required: (1) guardrails on platforms; (2) scaffolds and guardrails on scaffolds; (3) adequate fall protection equipment; (4) adequate lighting; and (5) workplace safety instruction.

---

[2] Plaintiff alleged that defendant was negligent and violated the ELA by:

"1) failing to remove materials stored in the vicinity of the walls to be painted which materials interfered with the painters' access to the walls to be painted;

"2) failing to provide or allow the use of scaffolding or manlifts;

"3) failing to provide reasonable or any means of ingress or egress to and from the roof of an interior storage room upon which the Defendant invited Plaintiff to stand and paint the walls;

"4) failing to provide a lifeline or other device for Plaintiff to attach his safety harness while painting the walls above the interior storage room;

"5) failing to install or provide railings on the edge of the roof of the interior storage room;

"6) failing to install or provide safety nets or padding around the edges of the roof of the interior storage room;

"7) failing to provide adequate lighting in the area surrounding the interior storage room;

"8) failing to implement and maintain a systematic maintenance schedule for the lights in the area where Plaintiff fell; and

"9) fail[ing] to develop and implement a fall protection program for its mill."

[3] As described below, 150 Or App at 402-04, the parties dispute whether plaintiff's allegations with respect to the OSEA sufficiently alleged either an independent statutory claim or a claim for negligence *per se*.

The case was tried to a jury. Before submission, defendant moved for a directed verdict against each of plaintiff's claims. Although the court denied the motions, it did strike all specifications of negligence other than those pertaining to inadequate lighting and all allegations of regulatory violations other than those pertaining to inadequate lighting. Thus, although plaintiff's negligence, negligence *per se* (based on OSEA) and ELA claims were submitted to the jury, the only allegations the jury actually considered concerned inadequate lighting. The jury returned a defense verdict, specifically determining that (1) defendant was not subject to the ELA; (2) defendant either had not violated the OSEA or, if so, that violation had not caused plaintiff's injuries; and (3) defendant was not negligent with respect to inadequate lighting or, if so, that negligence had not caused plaintiff's injuries.

On appeal, plaintiff raises 22 assignments of error that challenge: (1) the trial court's rulings striking all of his allegations other than those pertaining to inadequate lighting and (2) various rulings pertaining to the inadequate lighting allegations. Defendant, through four cross-assignments of error, argues that we need not address the particulars of plaintiff's assignments because, in all events, defendant was entitled to a directed verdict against each of plaintiff's claims in its entirety. For clarity of analysis, we begin by addressing the cross-assignments.

■ In its first cross-assignment, defendant contends that the court erred in denying a directed verdict against plaintiff's ELA claim in its entirety. Defendant argues that, even viewing the evidence most favorably to plaintiff,[4] plaintiff failed to prove the requisites of ELA liability. As explained below, we agree.

■■ The ELA imposes a heightened standard of care on employers or others who are in charge of work involving danger or risk to employees. *Miller v. Georgia-Pacific Corp.*, 294 Or 750, 753, 662 P2d 718 (1983). ORS 654.305 provides:

---

[4] We review the denial of a directed verdict in the light most favorable to the party opposing the motion; if there is some evidence to support each element of the claim, a directed verdict was appropriately denied. *Hickey v. Settlemier*, 141 Or App 103, 108, 917 P2d 44, *rev den* 323 Or 690 (1996).

> "Generally, all owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employees or the public, shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices."

The ELA applies not only to direct employers but also to "indirect employers." *See, e.g., Miller,* 294 Or at 754.

■■ Here, plaintiff asserted that defendant was his indirect employer for ELA purposes. Before a defendant can be held liable as an indirect employer under the ELA,

> "the defendant must be in charge of or have responsibility for work involving risk or danger in either (a) a situation where defendant and plaintiff's employer are simultaneously engaged in carrying out work on a common enterprise, or (b) a situation in which the defendant retains a right to control or actually exercises control as to the manner or method in which the risk-producing activity is performed." *Miller,* 294 Or at 754 (citations omitted).

Thus, "indirect employer" liability is triggered if any of three *disjunctive* tests is satisfied: (1) the "common enterprise" test; (2) the "retained control" test; or (3) the "actual control" test. *Id.; see also Wilson v. P.G.E. Company,* 252 Or 385, 391-92, 448 P2d 562 (1969); *Quackenbush v. PGE,* 134 Or App 111, 114-16, 894 P2d 535, *rev den* 322 Or 193 (1995). Defendant contends that none of those tests was met; conversely, plaintiff asserts that the evidence was sufficient to satisfy any or all of those tests.

■ We first consider "common enterprise" liability. To be held liable as a participant in a "common enterprise," a defendant employer must "do more than have its own employees working with plaintiff toward the furtherance of a common enterprise." *Sacher v. Bohemia, Inc.,* 302 Or 477, 485, 731 P2d 434 (1987). Rather, the defendant must exercise "control or charge over the activity or instrumentality that causes the injury[.]" *Id.* at 486 (footnote omitted):

"When, as the result of the activities of defendant's employees or use of his equipment, a risk of danger is created which contributes to an injury to plaintiff who is the employee of another engaged in work on the same project, defendant has been considered to have sufficient control over the work to be subject to the duties imposed by the [ELA]. * * * We do not construe the ELA to impose a duty upon each employer, engaged in a common enterprise with another, to make safe the equipment and method of work of the other, even though both have a measure of control over the activity in which they are jointly engaged. The injury must result by virtue of the commingling of the activities of the two employers and not be solely attributable to the activities or failures of the injured workman's employer." *Wilson*, 252 Or at 391-92 (citation omitted).

*See Quackenbush*, 134 Or App at 115 ("Although an employer can be 'in charge' of an activity that forms only a component part of the common enterprise, that component part must be part of the commingling of the activities of the two employers out of which the injury arises."); *Schroeder v. Northrop Services, Inc.*, 86 Or App 112, 118-19, 739 P2d 33, *rev den* 304 Or 185 (1987) (the defendant's participation in joint activity and the plaintiff's injury were causally linked).

■ The thrust of those holdings is that, to trigger common enterprise liability, there must be a causal link between the defendant's involvement in joint work and the plaintiff's injury. Here, there was no such nexus. Viewed most favorably to plaintiff, the evidence established that plaintiff's employer, Partridge, and defendant were both participants in the project of "sprucing up" the St. Helens mill in preparation for a visit by Boise Cascade executives. Partridge was painting certain areas of the plant, and defendant's employees were also involved in painting and clean-up activities. However, defendant's involvement in that regard had no causal relationship to plaintiff's injury. There was no evidence that defendant's employees were involved in painting in the core room or that plaintiff's injury resulted from defective equipment provided by defendant.[5] *See Miller v. Georgia-Pacific Corp.*, 55 Or App 358, 362, 637 P2d 1354 (1981), *aff'd*

___

[5] There is no evidence that defendant's employees assisted Partridge's employees, including plaintiff, in their painting activities or that defendant shared any equipment with Partridge's employees, including plaintiff.

*in part, rev'd in part* 294 Or 750, 662 P2d 718 (1983) (no causal link demonstrated between the defendant's participation in joint work and the plaintiff's injury). In fact, there was no evidence that defendant was aware that plaintiff was using the sample room roof as a base for his painting. Consequently, "common enterprise" liability did not apply.

■ Nor did plaintiff's proof permit the imposition of "retained control" liability—*i.e.*, that defendant "retain[ed] a right to control * * * the manner or method in which the risk-producing activity [was] performed." *Miller*, 294 Or at 754. Plaintiff refers, particularly, to a work order, which provided that "[a]ll work is to be completed per the directions of owner's representative Rick Shaw." That work order was issued pursuant to the "annual contractor services agreement" between defendant and Partridge. That agreement provided:

> "[Partridge's] relationship with Boise Cascade shall in all respects be that of an independent contractor. Boise Cascade shall have no power to determine or control [Partridge's] manner of performing the Work except insofar as may be necessary to allow Boise Cascade to properly inspect the Work and ensure itself that [Partridge] is complying with the Contract Documents."

The agreement further provided that "[a]uthorization to perform Work shall be made by issuing a Work Order, which Work Order shall specify the *scope* of the Work to be performed[.]" (Emphasis supplied.) Thus, any retention of control by defendant necessarily pertained solely to the *scope* of Partridge's work—*i.e.*, what areas of the plant should be painted—and not to the "manner or method" of Partridge's performance. *See Miller*, 294 Or at 754. Accordingly, there was no basis for "retained control" liability.

■ Finally, defendant was not subject to ELA liability under the "actual control" test. There is no evidence that defendant ever told Partridge how to paint or which equipment to use. Nevertheless, plaintiff argues that the jury could have found that defendant exercised actual control over

the painting activities because: (1) a term in Partridge's contract with defendant stated that Partridge "accepts the physical condition of the Project Site at the time of [its] inspection"; (2) there is evidence that defendant asked Partridge and its employees not to move the cores; and (3) the presence of cores in the core room precluded the use of scaffolds and mechanized manlifts in performing the painting and, thus, forced Partridge's employees, including plaintiff, to use ladders. Thus, plaintiff reasons, defendant, by effectively precluding the use of certain equipment, exercised actual control over the manner and method of Partridge's work.

The fatal deficiency in plaintiff's "actual control" argument is—as defendant emphasizes—that Partridge, and Partridge alone, made the decision to use ladders, rather than scaffolds or manlifts, in painting the core room and that, in making that decision, Partridge's supervisors, Korpella and Tallon, determined that lifts were unnecessary and that ladders were safe. Moreover, although defendant had previously moved materials in other areas of the plant at Partridge's request, there was no evidence that, before making the decision to use ladders, Korpella or Tallon asked defendant to move the cores out of the core room to permit the use of scaffolds or manlifts. Defendant did not exercise actual control with respect to the painting of the core room.

The record did not permit the imposition of indirect employer ELA liability on any basis. Thus, the court erred in denying defendant's motion for a directed verdict against the ELA claim.

■ Defendant's second cross-assignment of error asserts that the court erred in failing to direct a verdict *in toto* against plaintiff's common-law negligence claim. As noted, 150 Or App at 395, the trial court struck all specifications of common-law negligence except those pertaining to inadequate lighting but submitted the latter to the jury. Defendant argues that where, as here, a property owner hires an independent contractor to perform specialized work, it cannot be liable to the contractor or its employees for injuries resulting from hazards that normally attend that contractor's work— *e.g.*, the risk of a painter falling. *See Esko v. Lovvold*, 272 Or 27, 30-31, 534 P2d 510 (1975); *Yowell v. General Tire &*

*Rubber*, 260 Or 319, 325, 490 P2d 145 (1971). In a related sense, defendant argues that, in any event, it could not be liable under principles of premises liability because

> "[t]he hazard here—falling off the sample room roof—was not a hazard defendant knew about, nor one it should have known about. The roof was a roof, not a work station. There is no evidence that anyone had ever worked up there before plaintiff decided to. Nor is there any evidence that defendant knew plaintiff would paint from the roof rather than bringing in a scaffold or lift. Without reason to suspect that plaintiff would use the roof as a makeshift scaffold, defendant had no duty to make it safe for him."

We agree with defendant that, under the analysis of *Yowell* and *Esko*, it was entitled to a directed verdict against plaintiff's common-law negligence claim. In *Yowell*, the defendant hired the plaintiff's employer to repair an advertising sign. In attempting the repair, the plaintiff placed his ladder against a second, lower, sign that had been defectively hung and that, ultimately, gave way, causing the plaintiff to fall. The plaintiff brought an action for negligence, contending that "he was upon the defendant's premises as an invitee to whom the defendant owed a duty to exercise reasonable care to provide a safe place to work." 260 Or at 322-23. The trial court granted the defendant's motion for an involuntary nonsuit, and the Supreme Court affirmed:

> "Regardless of whether defendant is to be viewed in its relation to plaintiff primarily as a possessor of land or as one who contracts for services, we believe the result in this case should be the same. * * *

> "Plaintiff's employer, the independent contractor, held itself out to the public as being engaged in the business of manufacturing, installing and repairing all kinds of signs. Defendant was therefore entitled to assume, until notice to the contrary, that plaintiff's employer and its employees who were sent to work on defendant's signs were proficient and expert in detecting any defects in signs which formed a danger to those working in or around them. Defendant was not shown to have known of the defect in the sign. Nor was it shown to have had any expertise concerning signs. * * *

> "A person who orders repairs or work to be done by a third party owes no duty to such third party or his workman

to discover and warn of any unknown dangerous conditions surrounding the work which fall within a special expertise or knowledge, not shown to have been had by the person ordering the work, and which the third party impliedly represents to the public that he possesses." *Id.* at 324-25 (footnote omitted).[6]

In *Esko*, the court reiterated *Yowell*'s analysis. There, the defendant trailer park owners hired the plaintiff's employer, which held itself out as being a specialist in installing and maintaining cables on utility poles, to restring some cables in defendants' park. A latently defective pole gave way, injuring the plaintiff. The trial court granted the defendant's motion for a directed verdict against the plaintiff's negligence claim, and the Supreme Court affirmed:

> "Plaintiff's employer held itself out to the public as having proficiency in the installation and maintenance of a cable strung on poles. Plaintiff, a lineman of considerable experience, was fully cognizant of the risks and dangers of his trade. Defendants were not shown to possess any special expertise or familiarity with poles beyond that possessed by an ordinary landowner, and had no actual knowledge of the defect in the pole. Under these circumstances, defendants were entitled to rely upon the expertise of plaintiff and his employer to deal with unknown dangerous conditions necessarily encountered in the performance of their special skills." 272 Or at 30-31 (footnotes omitted).

The same principles apply here. Each of plaintiff's nine specifications of common-law negligence pertained to defendant's failure to take particular measures to insure the safety of the painting contractors—*e.g.*, providing safety harnesses, railing, fall protection, adequate lighting, etc. The advisability and efficacy of those measures was a matter peculiarly within Partridge's "special expertise or knowledge." Partridge, not defendant, was the expert in painting and painter safety.

Plaintiff argues, nevertheless, that *Yowell* and *Esko* are inapposite because here, unlike in those cases, the unsafe condition was obvious, not hidden: "The risk in this case was

---

[6] In so holding, the court reserved the issue of "what duty, if any, defendant would have owed had it known of the defect." *Yowell v. General Tire & Rubber*, 260 Or 319, 325 n 1, 490 P2d 145 (1971).

a fall from a nine foot roof[.] * * * The risk of falling is obvious to all employers[.]" Even if we were to agree with plaintiff that the *Yowell/Esko* analysis does not apply if the defendant owner knows of a defect or hazard—a question *Yowell* itself expressly reserved[7]—defendant would still have been entitled to a directed verdict because there was no evidence from which the jury could conclude that defendant knew that plaintiff would paint from the roof of the sample room. In particular, there is no evidence that defendant knew that plaintiff, or any painter, intended to use the sample room roof as a work platform. Nor was there evidence that the roof had ever been so used.

There were, in short, no circumstances alerting defendant, "as a reasonably prudent landowner, * * * that the premises might not be safe[.]" *Wriglesworth v. Doyle*, 244 Or 468, 472-73, 417 P2d 999 (1966). Consequently, the trial court erred in denying defendant's motion for a directed verdict against plaintiff's common-law negligence claim.

 Defendant's third cross-assignment of error asserts that the trial court erred in denying defendant's motion for a directed verdict against plaintiff's allegations that defendant had violated the Oregon Safe Employment Act (OSEA). Before addressing the substance of that contention, we must dispose of a preliminary matter that preoccupies the parties. Defendant argues, at some length, that there is no private statutory right of action under the OSEA. Conversely, plaintiff contends that the OSEA does, at least implicitly, give rise to a statutory right of action. We decline to resolve that issue because, given the procedural posture of this case, it is inapposite.

Plaintiff's operative second amended complaint consisted of two "counts," one captioned "Negligence," and the other, "Employer's Liability Law." The negligence "count," in turn, included one paragraph, which alleged nine specifications of negligence without reference to the OSEA,[8] and six

---

[7] *See* 150 Or App at 401 n 6. We note, parenthetically, that, at least in some circumstances, plaintiff's "obvious hazard" analysis is tautological. For example, if a homeowner hires a specialist to patch a roof or to prune some trees, the risk of a fall is obvious. Under plaintiff's reasoning, the homeowner could be liable in negligence for failing to provide a railing or fall protection.

[8] *See* 150 Or App at 394 n 2.

other paragraphs, which alleged that defendant had violated 13 occupational safety regulations, promulgated pursuant to the OSEA and set out in OAR chapter 437, designated "The Oregon Occupational Safety and Health Code" (OOSHC).[9] With respect to each of those regulations, plaintiff alleged that he

"was within the class of persons intended to be protected by the regulation, his injury was of the type intended to be avoided by the regulation, and his injury was caused by the Defendant's violation of the regulation."

Those matters were pleaded solely within plaintiff's negligence "count"; his complaint did not plead a separate claim for relief under the OSEA. Ultimately, and consistent with the configuration of plaintiff's pleadings, the trial court instructed the jury that violation of the OSEA, and, particularly, pertinent OOSHC lighting standards, would constitute negligence *per se*. Plaintiff did not ask that the jury be

---

[9] Plaintiff alleged that defendant violated particular regulations. Those regulations were in effect at the time of the accident. Since that time, several of the regulations have been modified, but those subsqunt changes do not affect our analysis. Also, in 1997, the Department of Consumer and Business Services changed the numbering system and the form of its regulations. Throughout this opinion, we refer to the regulations that were in effect at the time of the accident.

Plaintiff alleged that defendant violated the following regulations:

OAR 437-02-D-1910.23(c) (requiring guardrails on platforms);

OAR 437-03-M-1926.500(a), (d) (requiring guardrails on platforms);

OAR 437-02-D-1910.28(a)(1) (requiring scaffolds);

OAR 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.451(a)(4) (requiring guardrails on scaffolds);

OAR 437-02-I-1910.132 (requiring protective equipment to protect against work hazards);

OAR 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.28 (requiring protective equipment to protect against work hazards);

OAR 437-03-040 (requiring employees' fall protection);

OAR 437-03-045 (requiring fall protection);

OAR 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.104 (requiring fall protection equipment);

OAR 437-03-C-1926.26 (requiring adequate illumination of work areas);

OAR 437-03-C-1926.56 (requiring adequate illumination of work places);

OAR 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.20(a)(1) (proscribing contractors from requiring laborers to work in unsanitary, hazardous, or dangerous conditions);

OAR 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 (requiring employee instruction on avoiding unsafe conditions). No such regulation exists; however, in its brief, plaintiff cites OAR 437-03-C-1926.21(b)(2), which pertains to the same subject matter.

instructed on some separate right of action under the OSEA and does not contend that the trial court generally erred in instructing the jury on negligence *per se*.[10] Thus, the only issue before us is whether the trial court erred in denying a directed verdict against plaintiff's OSEA-based negligence *per se* allegations.

The OSEA provides:

"Every employer, owner, employee and other person shall obey and comply with every requirement of every order, decision, direction, standard, rule or regulation made or prescribed by the department in connection with the matters specified in ORS 654.001 to 654.295 and 654.750 to 654.780, or in any way relating to or affecting safety and health in employments or places of employment, or to protect the life, safety and health of employees in such employments or places of employment, and shall do everything necessary or proper in order to secure compliance with and observance of every such order, decision, direction, standard, rule or regulation." ORS 654.022.

Defendant argues that, as a matter of law, it could not be liable for negligence *per se* based on the OSEA, because plaintiff was not its direct employee. Defendant is correct—but only to a point. We have held that the OSEA "does not extend its coverage to indirect employees" and have sustained a dismissal · of negligence *per se* claims on that basis. *German v. Murphy*, 146 Or App 349, 357, 932 P2d 580 (1997); *see Flores v. Metro Machinery Rigging, Inc.*, 99 Or App 636, 641, 783 P2d 1024 (1989), *rev den* 309 Or 521 (1990) ("The purpose of the SEA is to require an employer to take necessary steps to protect its own employees, not those of other employers.").

The difficulty with defendant's argument is that it ignores—or, at least, does not adequately acknowledge—the OSEA's express application to "owner[s]." ORS 654.022. The statute defines "owner" as "every person having ownership, control or custody of any place of employment." ORS 654.005(6).[11] Defendant owned the St. Helens plant.[12] Thus,

---

[10] Plaintiff does assign error to certain particulars of the court's negligence *per se* instructions but not to the propriety of instructing on negligence *per se* in general.

[11] ORS 654.005(8) defines "place of employment":

" 'Place of employment' means and includes every place, whether fixed or movable or moving, whether indoors or out or underground, and the premises

defendant, as owner, is subject to the OSEA. The critical question remains: What is the scope of an owner's obligations under the OSEA?

■ The only reported decision squarely addressing that issue is *Moe v. Beck*, 100 Or App 177, 785 P2d 781 (1990), *aff'd* 311 Or 499, 815 P2d 692 (1991). In *Moe*, the defendant owned a dump truck which it leased to another party, who, in turn, subleased the truck to the plaintiff's employer. The plaintiff was injured when the truck's brakes failed. The plaintiff sued the defendant, alleging that the defendant had been negligent in failing to comply with various OOSHC regulations, including requirements that vehicles have effective brake systems that are regularly tested and serviced. The defendant successfully moved for summary judgment, contending that it had no liability as an "owner" under the OSEA.

This court, in banc, reversed:

"The legislature did not define as 'owner' any person with 'ownership, control *and* custody.' Rather, it defined as 'owner' any person who has 'ownership, control *or* custody.' ORS 654.005(6). [Defendant] is the record owner. The statute does not distinguish between various types of ownership interests. We may not insert what the legislature omitted from the statute. ORS 174.010." 100 Or App at 180-81 (footnotes omitted; emphasis in original).

Two judges dissented, asserting that "[t]he majority's application of the literal meaning of 'owner' produces an absurd result. * * * 'Owner,' in the context of the SEA means a person who has the ability to comply with ORS 654.022[.]"

and structures appurtenant thereto, where either temporarily or permanently an employee works or is intended to work and every place where there is carried on any process, operation or activity related, either directly or indirectly, to an employer's industry, trade, business or occupation, including a labor camp provided by an employer for employees or by another person engaged in providing living quarters or shelters for employees, but 'place of employment' does not include any place where the only employment involves nonsubject workers employed in or about a private home."

[12] In *German v. Murphy*, 146 Or App 349, 932 P2d 580 (1997), and *Flores v. Metro Machinery Rigging, Inc.*, 99 Or App 636, 783 P2d 1024 (1989), *rev den* 309 Or 521 (1990), the defendant subcontractors who were the object of the OSEA-based claims did not own the premises where the injuries occurred.

*Id.* at 182-83 (Edmonds, J., dissenting). In response to that "absurd result" assertion, the majority observed:

"The dissent would have us read out of the statute the word 'or' and, instead, redefine 'owner' as a person who is in a position to exercise control over a workplace. The dissent's reworking of the definition of 'owner' is based on its opinion that the legislature did not intend that 'ownership' of a workplace should be a sufficient basis for having to comply with SEA, even though that is what the statute clearly says. * * * Perhaps the dissent, or even the majority, would make a different policy choice if that were our responsibility, but requiring an owner of a workplace to comply with the SEA, even an owner who has chosen not to exercise actual control, cannot be said to be absurd; nor is it inconsistent with the policy of making every Oregon workplace a safe place." *Id.* at 180-81 n 3.

On review, the Supreme Court affirmed our holding, concluding that the defendant was a "person having ownership * * * of [a place of employment]." ORS 654.005(6). In so holding, the court observed:

"The OSEA refers to 'owner' on only six occasions. In those provisions where 'owner' does appear, its use suggests that the 'owner' possesses some involvement with the work activity or workplace. ORS 654.015 prohibits an 'owner' from *'construct[ing] or caus[ing]* to be constructed or maintained' unsafe places of employment. (Emphasis added.) ORS 654.067 permits safety and health authorities to inspect the workplace premises 'upon presenting appropriate credentials to the owner, employer or agent in charge.' We read 'agent *in charge*' (emphasis added) to mean either the 'employer's' or the 'owner's' agent. One reasonable import of the statute's language is that the word 'owner' is used in a vein similar to the word 'employer,' one who performs an authoritative or supervisory function. Similarly, ORS 654.150 and 654.160 combine to require the owner of a construction site and the employer of the construction crew to specify in the construction contract which party will supply sanitation facilities at the work site. If no such provision appears in the contract, the owner of the site is liable for the employer's costs associated with providing such facilities. The tenor of the OSEA's provisions with regard to an 'owner's' responsibilities arguably suggests that the 'owner' is one who enjoys some degree of involvement with the work

or workplace. Even though the word 'owner' is ambiguous, as demonstrated by the Oregon cases and statutes cited above, it is nonetheless clear that the OSEA defines an owner in three *alternative* ways: First, as a person who has 'control' of a place of employment. *Or* second, as a person who has 'custody' of a place of employment. *Or* third, as a person 'having ownership' of a place of employment.

"* * * * *

"Under the contract between the defendant and Beck, the defendant has an ownership interest. * * * In the absence of some legislative history indicating that the legislative intent was that the OSEA not apply to persons in the position of the defendant, we interpret the OSEA to include a lessor in the position of the defendant within the definition of 'owner.' " 311 Or at 504-05 (footnotes omitted; emphasis in original).

Thus, at least in some circumstances, ownership of a premises where OSEA violations occur is sufficient to support negligence *per se* liability even if the defendant had no direct involvement in, or control over, the injury-producing activity. *Id.*

Read broadly, *Moe* could be viewed as subjecting owners to negligence *per se* liability any time a worker is injured on premises because of an OSEA violation. That would be so regardless of the owner's relationship to the worker or to the OSEA violation. Such an expansive reading would yield remarkable results. Taken to its logical extension, it would require property owners who hire specialized subcontractors—*e.g.*, roofers, window washers, painters—to oversee the safety-related details of their work and to provide safety equipment or face possible negligence *per se* liability based on the OSEA. That would, of course, largely abrogate the long-standing common-law limitations of negligence liability with respect to specialized contractors described above. *See* 150 Or App at 399-402.

Conversely, ownership liability under the OSEA, as construed in *Moe*, may—and we believe should—be cast more narrowly. In particular, and consistent with the requirements of negligence *per se*, such liability arises only when the

*defendant owner* has violated an applicable OOSHC regulation. *See, e.g., McAlpine v. Multnomah County,* 131 Or App 136, 144, 883 P2d 869 (1994), *rev den* 320 Or 507 (1995) (reiterating principle that negligence *per se* is premised on defendant's violation of a statute). That is, the mere fact that a plaintiff has been injured on a defendant's premises as a result of an OSEA violation is not enough to trigger negligence *per se* liability; rather, the defendant itself must have violated the applicable requirement. Thus, the defendant owner is liable only if the regulation whose violation underlies the OSEA claim is one that either explicitly, or by nature, imposes obligations on owners of premises.

*Moe* itself is exemplary. There, the ordinary and foreseeable use of the "workplace" that the defendant owned—the dump truck—was driving. Providing and maintaining adequate brakes was essential to the continuing structural integrity and safe operation of that "workplace" in its ordinary and intended manner. Thus, although the regulations underlying the plaintiff's negligence *per se* claim in *Moe* did not expressly refer to owners, the defendant there was nevertheless subject to those regulations. An analogous hypothetical would be if Boise Cascade were to lease its paper mill to a third party, and an employee of that party were injured because of unguarded machinery, in violation of the OSEA; in that circumstance, Boise Cascade, as owner, could be subject to negligence *per se* liability.

Conversely, other OOSHC regulations, which pertain to work practices or methods, as opposed to requirements pertaining to workplace structures or safeguards, may not apply to owners. For example, nothing in the text or context of the OSEA suggests that owners (as distinct from employers) are subject to requirements pertaining to lifelines, safety belts, or lanyards. *See, e.g.,* OAR 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.28, discussed below at 150 Or App at 410-11.

We turn, then, to plaintiff's particular allegations of OSEA-based negligence *per se* to determine which, if any, of the regulations underlying those allegations applies to owners. Plaintiff's specifications fall into five general categories: (1) failure to provide safety instruction; (2) failure to provide railings; (3) failure to furnish scaffolds, including guarded

scaffolds; (4) failure to provide protection against fall hazards; and (5) inadequate lighting/illumination. *See* 150 Or App at 403 n 9.

■ Plaintiff's "inadequate [safety] instruction" specification was deficient as a matter of law. OAR 437-03-C-1926.21(b)(2), by its terms, applies only to employers.[13] Owners have no responsibility under that provision.

■ Plaintiff's "failure to provide guardrails" specifications, based on OAR 437-02-D-1910.23(c) and OAR 437-03-M-1926.500(a) and (d),[14] were legally insufficient because, even if it is assumed that those regulations apply to owners generally, they were inapposite here. In particular, the former regulation applies only to "platforms," and the sample room roof was not a "platform" for purposes of that regulation. OAR 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.21(a)(4) defines "platform" as "[a] working space for persons, elevated above the surrounding floor or ground; such as a balcony or platform for the operation of machinery and equipment." Here, there is no evidence

---

[13] OAR 437-03-C-1926.21(b)(2) provides:

"The employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury."

[14] OAR 437-02-D-1910.23(c) provides, in part:

"(1) Every open-sided floor or platform 4 feet or more above adjacent floor or ground level shall be guarded by a standard railing (or the equivalent as specified in paragraph (e)(3) of this section) on all open sides except where there is entrance to a ramp, stairway, or fixed ladder. The railing shall be provided with a toeboard wherever, beneath the open sides:

"(i) Persons can pass.

"(ii) There is moving machinery, or

"(iii) There is equipment with which falling materials could create a hazard."

OAR 437-03-M-1926.500(a) and (d) provide, in part:

"(a) This subpart shall apply to temporary or emergency conditions where there is danger of employees or materials falling through floor, roof, or wall openings, or from stairways or runways.

"* * * * *

"(d)(1) Every open-sided floor or platform 6 feet or more above adjacent floor or ground level shall be guarded by a standard railing, or the equivalent, as specified in paragraph (f)(1)(i) of this section, on all open sides, except where there is entrance to a ramp, stairway, or fixed ladder. The railing shall be provided with a standard toeboard wherever, beneath the open sides, persons can pass, or there is moving machinery, or there is equipment with which falling materials could create a hazard."

from which a jury could conclude that the sample room roof had ever been used as a "working space" or that defendant knew that plaintiff would use it for that purpose. *See* 150 Or App at 401-02.

The second regulation, OAR 437-03-M-1926.500(a) and (d), similarly pertains to "platforms" but does not define that term. Nevertheless, in context, we find that definition of "platform" in OAR 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.21(a)(4) to be instructive and conclude that the guardrail standard of OAR 437-03-M-1926.500(a) and (d) did not apply to the sample room roof.

■ Plaintiff's "scaffolding" specifications are based on OAR 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.451(a)(4) and OAR 437-02-D-1910.28-(a)(1).[15] Regardless of whether those regulations pertaining to the erection of temporary structures apply to owners generally, plaintiff's specifications were deficient in two respects. First, the former applies only to platforms or scaffolds at least 10 feet high; here, the sample room roof, even if it could be properly characterized as a "scaffold" or "platform," was only nine feet high. Second, the latter does not require scaffolding in all instances, but, instead, explicitly permits the use of ladders, as Partridge did in this case.[16]

■ Plaintiff's "inadequate fall protection" specifications fail because the underlying regulations, OAR 437-02-I-1910.132, OAR 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.28, OAR 437-03-040, OAR 437-03-045, and OAR 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.104, by their nature, pertain to the method and manner of work and, thus, do not apply to owners.[17] That construction is textually and contextually buttressed by the explicit imposition of employer responsibility

---

[15] OAR 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.451(a)(4) provides:

"Guardrails and toeboards shall be installed on all open sides and ends of platforms more than 10 feet above the ground or floor, except needle beam scaffolds and floats (see paragraphs (p) and (w) of this section). Scaffolds 4 feet to 10 feet in height, having a minimum horizontal dimension in either direction of less than 45 inches, shall have standard guardrails installed on all open sides and ends of the platform."

OAR 437-02-D-1910.28(a)(1) provides:

"Scaffolds shall be furnished and erected in accordance with this standard for persons engaged in work that cannot be done safely from the ground or from solid construction, except that ladders used for such work shall conform to § 1910.25 and § 1910.26."

[16] Plaintiff does not contend that the ladders Partridge supplied for the core room painting did not conform to applicable regulations.

[17] OAR 437-02-I-1910.132(a) provides:

in OAR 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.28. A contrary conclusion would obligate nonemployer owners to oversee the details of work performed on their premises and to provide specialized safety equipment.

Finally, plaintiff alleges violation of OSHA lighting regulations:

"OAR 437-03-C-1926.26 and OAR 437-03-C-1926.56 of the state OSHA code requires adequate illumination in construction areas and storage areas where work is in progress and warehouses of not less than 5 foot-candles, and in general construction plants and shops of not less than 10 foot-candles. The lighting provided by Defendant at the location where Plaintiff fell was less than that required by the regulations. Plaintiff was within the class of persons intended to be protected by the regulation, his injury was of the type intended to be avoided by the regulation, and his injury was caused by the Defendant's violation of the regulation."

OAR 437-03-C-1926.26 provides:

"Protective equipment, including personal protective equipment for eyes, face, head, and extremities, * * * and protective shields and barriers, shall be provided, used, and maintained in a sanitary and reliable condition whenever it is necessary by reason of hazards of processes or environment[.]"

OAR 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.28 provides:

"(a) The employer is responsible for requiring the wearing of appropriate personal protective equipment in all operations where there is an exposure to hazardous conditions or where this part indicates the need for using such equipment to reduce the hazards to the employees.

"(b) Regulations governing the use, selection, and maintenance of personal protective and lifesaving equipment are described under Subpart E of this part."

OAR 437-03-040 provides, in part:

"(1) All employees shall be protected from fall hazards when working on unguarded surfaces more than 10 feet above a lower level or at any height above dangerous equipment, except when connecting steel beams as stipulated in OAR 437-03-040(2)."

OAR 437-03-045(2) is merely a definitional section that, in defining "dangerous equipment," includes:

"Equipment such as pickling or galvanizing tanks, degreasing units, machinery, electrical equipment, and other units which, as a result of form or function, may be hazardous to employees who fall onto or into such equipment."

OAR 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.104 provides, in part:

"(b) Lifelines shall be secured above the point of operation to an anchorage or structural member capable of supporting a minimum dead weight of 5400 pounds."

"Construction areas, aisles, stairs, ramps, runways, corridors, offices, shops, and storage areas where work is in progress shall be lighted with either natural or artificial illumination. The minimum illumination requirements for work areas are contained in Subpart D of this part."

OAR 437-03-C-1926.56 similarly provides, in part:

"(a) Construction areas, ramps, runways, corridors, offices, shops, and storage areas shall be lighted to not less than the minimum illumination intensities listed in Table D-3 while any work is in progress[.]"

Table D-3, referred to in the latter rule, specifies "Minimum Illumination Intensities in Foot-Candles" for work areas according to function or operation:

"5...General construction area lighting.

"3...General construction areas, concrete placement, excavation and waste areas, accessways, active storage areas, loading platforms, refueling, and field maintenance areas.

"5...Indoors: warehouses, corridors, hallways, and exitways.

"5...Tunnels, shafts, and general underground work areas: (Exception: minimum of 10 foot-candles is required at tunnel and shaft heading during drilling, mucking, and scaling. Bureau of Mines approved cap lights shall be acceptable for use in the tunnel heading.)

"10..General construction plant and shops (e.g., batch plants, screening plants, mechanical and electrical equipment rooms, carpenter shops, rigging lofts and active storerooms, barracks or living quarters, locker or dressing rooms, mess halls, and indoor toilets and workrooms).

"30..First aid stations, infirmaries, and offices."

Defendant argues that those regulations are inapposite because they apply only when "work is in progress" and that there was no evidence that any of defendant's employees were working in the core room, much less near the sample room, when the accident occurred. Plaintiff responds that defendant's argument improperly focuses on *its own* employees and ignores its obligation, under the OSEA, as

owner of the mill. In particular, defendant reasons, *he* was working at the time of the accident and because *that* work was "in progress," the lighting regulations applied to defendant in its capacity as owner.

Defendant is correct if OAR 437-03-C-1926.26 and OAR 437-03-C-1926.56 generally apply to owners, as well as to employers. The question is close. On one hand, the lighting requirements are defined by reference to the general structure and function of the work area—office, warehouse, etc. In that respect, the lighting standards are similar to the brake requirements in *Moe* and should support owner liability. Conversely, the regulations' "work in progress" language seems to pertain to workplace practices or methods; that is, whether the regulations apply—and are violated—depends on what is being done in a given place at a given time.

We conclude that the lighting regulations at issue here do apply to owners. That is, owners are obligated, as a structural matter, to equip workplaces with lighting adequate for the work that ordinarily would occur within that type of work space. In so holding, we need not decide what an owner's obligation might be if a lessee converted one type of space to another type of use—*e.g.*, converting a warehouse into a construction shop or a storage room into an office. Nor do we imply any view that an owner who has equipped a work space with adequate lighting could, nevertheless, be subject to negligence *per se* liability if a lessee/employer failed to make use of such lighting while work was in progress. The point, for present purposes, is simply that, just as an owner of a work vehicle must provide adequate brakes, an owner of a work space must equip that space with lighting adequate for the work ordinarily performed within that space.

Given our conclusion that OAR 437-03-C-1926.26 and OAR 437-03-C-1926.56 did apply to defendant in the fashion just described, plaintiff's negligence *per se* allegations based on those regulations were legally sufficient.[18] Consequently, although the trial court correctly struck all of plaintiff's negligence *per se* allegations except those pertaining to

---

[18] Defendant does not contend that plaintiff did not otherwise satisfy the requirements of negligence *per se* with respect to those allegations. In particular, defendant does not dispute either that plaintiff was a member of the class of per-

inadequate lighting, it did not err in denying defendant's motion for a complete directed verdict against plaintiff's negligence *per se* claims. We thus reject defendant's third cross-assignment of error.

Defendant's fourth and final cross-assignment of error is that the court erred in denying its directed verdict motion as to plaintiff's inadequate lighting specifications because plaintiff failed to prove that inadequate lighting caused him to fall. Plaintiff responds that his evidence of causation was sufficient. We agree with plaintiff that the evidence was sufficient to permit the jury to reasonably infer causation, and we reject the final cross-assignment of error without elaboration.

We turn, then, to plaintiff's 22 assignments of error. Our discussion and disposition of the cross-assignments necessarily disposes of plaintiff's first six assignments of error, as well as his 18th, 19th, and 21st assignments, all of which pertain to his ELA and common-law negligence claims or to his negligence *per se* allegations other than those pertaining to inadequate lighting.

Plaintiff's seventh through tenth assignments of error concern the trial court's instructions to the jury regarding the applicable lighting standard under the OSEA. Plaintiff argues, particularly, that the trial court should have ruled, as a matter of law, that the minimum standard was 10 foot-candles, the standard applicable for general construction plants and shops. Plaintiff contends that the trial court erred in failing to give a peremptory instruction to that effect and, instead, in instructing the jury that plaintiff had the burden of proof as to what lighting standard applied.[19]

Plaintiff's premise is that he was entitled to a peremptory instruction because the necessary facts as to which

---

sons meant to be protected under the regulations or that plaintiff's injury was not of the type that the regulation was enacted to prevent.

[19] The trial court submitted the lighting claim to the jury, allowing it to decide which lighting standard applied. It read the pertinent regulation as part of the jury instructions, and provided a table, *see* Table D-3 set out at 150 Or App at 412, by which the jury could determine the appropriate standard. The chart provided the proper lighting standards (measured in foot-candles) for the different operating areas of a workplace.

lighting standard applied were undisputed. Defendant responds that there were issues of fact as to which lighting standard applied and, therefore, the question was correctly submitted to the jury.

Defendant is correct. Although the interpretation and application of safety regulations may properly be a subject for a peremptory instruction, *see, e.g., Hagan v. Gemstate Manufacturing, Inc.*, 148 Or App 192, 939 P2d 141 (1997), factual disputes precluded giving such an instruction here. *Compare Hagan*, 148 Or App at 194-95 (no factual dispute as to configuration of vehicles subject to "anti-underride" regulation).

As explained above, the lighting regulations at issue in this case require different minimum levels of lighting for different areas of operation. Here, there was a factual issue as to which lighting standard applied because different witnesses described the pertinent work space differently. In particular, there was a factual issue as to whether the core room was: (1) an "active storage area," thus requiring the lowest level of lighting, three foot-candles; (2) a warehouse, requiring an illumination of five foot-candles; or (3) a "general construction plant and shop," requiring lighting of at least 10 foot-candles. The issue was further complicated because the sample room roof from which plaintiff fell was located in one corner of the much larger core room. Given those factual disputes, the court properly rejected plaintiff's proposed peremptory instruction and correctly submitted to the jury the question of which lighting standard applied.

■ We bypass plaintiff's 11th assignment of error and proceed to his 12th assignment, which is dispositive. Plaintiff's 12th assignment of error challenges the exclusion of certain testimony by plaintiff's industrial hygienist, Gilmore.[20] Gilmore, who holds a masters degree in industrial hygiene, had provided industrial health and safety consultation to businesses and governmental entities, including the Atomic

---

[20] Gilmore described an "industrial hygienist" as follows: "An industrial hygienist is an individual specialized in health, safety, and environmental affairs primarily in an industrial environment. In a workplace setting, evaluating health and hazards. In the workplace identifying, evaluating them, and recommending controls."

Energy Commission and the United States Department of Labor, for 21 years. Most of Gilmore's testimony, as presented via an offer of proof, pertained to matters that ultimately, and correctly, were not presented to the jury, such as guardrail and scaffolding requirements, personal protective equipment, and fall protection; thus, any error in the exclusion of that testimony was necessarily harmless. However, Gilmore also would have testified about matters pertaining to plaintiff's inadequate lighting allegations that were properly submitted to the jury. In the offer of proof, Gilmore testified that he had reviewed, *inter alia*, "light measurements taken at the accident scene." He then testified:

"Q [By plaintiff's counsel] And what about illumination? At my request, did you also investigate the illumination standards?

"A I did. And I believe the standard that would apply in this area as well would be five foot-candles of illumination at the point of work would be the minimum standard. There may also be (indiscernible), but if you really go back and review the standard, the actual number that applies is clearly five foot-candles in those work areas. And I saw some data that indicated that the levels were far below that."

Defendant objected to Gilmore's putative testimony, including the lighting standard testimony, asserting that it should not be admitted under OEC 702, because it was not properly the subject of expert testimony. The court sustained that objection, concluding that Gilmore's testimony "would not assist the jury in assessing what hazards were present and, in fact, would only confuse the jury and tend to give undue weight to a person's opinion on a matter that's fully within the competence of the jury to assess and determine themselves." With due respect, we disagree.

OEC 702 provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

Such testimony may embrace "an ultimate issue to be determined by the trier of fact." OEC 704.

■ Where, as here, the trial court excluded the expert's testimony on grounds other than the witness's lack of qualification or competence,[21] the court's discretion is somewhat circumscribed. In such circumstances, the court's exercise of discretion is tested against the principle that such testimony should be admitted if that testimony would materially "aid or * * * help the jury to conclude the ultimate question framed by the pleadings." *Yundt v. D & D Bowl, Inc.*, 259 Or 247, 258, 486 P2d 553 (1971):

> "[T]he only true criterion is: On *this subject* can a jury from *this person* receive appreciable help? In other words, the test is a relative one, depending on the particular subject and the particular witness with reference to that subject * * *." 7 Wigmore, *Evidence* (3d ed) 21, § 1923, quoted with approval in *Yundt*, 259 Or at 258 (emphasis in originally quoted material).

In *State v. Brown*, 297 Or 404, 409, 687 P2d 751 (1984), the court generally reiterated:

> "Under the Oregon Evidence Code and traditional evidence law, expert testimony is admissible if it is relevant under OEC 401 and will help the trier of fact in deciding a disputed issue. To be helpful, the subject of the testimony must be within the expert's field, the witness must be qualified, and the foundation for the opinion must intelligibly relate the testimony to the facts. If these conditions are satisfied, the testimony will be excluded only if it is unduly prejudicial, repetitive, or falls under some other exclusionary provision as provided in OEC 403[.]
>
> "* * * * *
>
> "In applying OEC 401, 702 and 403, this court must identify and evaluate the probative value of the evidence, consider how it might impair rather than help the factfinder, and decide whether truthfinding is better served by exclusion or admission."

---

[21] Defendant did not object to Gilmore's competence. The Supreme Court has held that exclusion of "expert" testimony on that ground is a matter of broad discretion. *Myers v. Cessna Aircraft*, 275 Or 501, 519-20, 553 P2d 355 (1976).

*See also State v. O'Key*, 321 Or 285, 297-99, 899 P2d 663 (1995) (quoting *Brown* with approval); *Paragano v. Gray*, 126 Or App 670, 681, 870 P2d 837 (1994) ("A court should admit expert testimony when it is clear that the jury needs the help of an expert to find the truth and should exclude it when it does not. Between those extremes, the decision to admit the testimony is within the discretion of the court.").

Applying those principles, we conclude that the court erred in excluding Gilmore's testimony with respect to inadequate lighting. That testimony was highly relevant to two crucial and disputed issues on the inadequate lighting allegations: (1) Which minimum lighting standard applied to the area where plaintiff was injured? And (2) did the lighting that defendant provided meet that standard? Gilmore's expert opinion regarding the correct lighting standard, based on his expert assessment of the proper classification or characterization of the work area where plaintiff was injured— *i.e.*, warehouse vs. active storage area—would have aided the jury in its determination of that technically complex question. Similarly, Gilmore's testimony pertaining to violation, based on his assessment of light measurements and readings, could have materially assisted the jury on the second issue. Thus, contrary to the trial court's observation, Gilmore's testimony on inadequate lighting would have assisted the jury "in assessing what hazards were present."

Conversely, we cannot agree that, at least as summarized in the offer of proof, Gilmore's testimony with respect to inadequate lighting would have been unduly confusing or prejudicial. As described above, that testimony would have pertained to two central issues, and there is no reason on this record to conclude that the jury would have given that testimony "undue" weight. We thus conclude that the trial court erred in excluding that testimony.

We further conclude that the error was not harmless. Although evidentiary error is not presumed to be prejudicial, OEC 103(1), reversal is required where that error "substantially affect[ed] the rights of a party." ORS 19.125(2). *See Baker v. English*, 324 Or 585, 589-93, 932 P2d 57 (1997) (discussing methods for determining whether error resulted in prejudice to party). In applying ORS 19.125(2), the Supreme

Court and this court have often framed the inquiry in terms of "likelihood that the error affected the result." *See id.* at 590-91 (noting various formulations by which error was held reversible where "it is likely that [error] affected the outcome"; "error either did or may have affected the outcome"; or error "might have affected the jury's consideration of the evidence").

 In the evidentiary context, we have held that error warrants reversal where the erroneously excluded evidence would have had "some likelihood of affecting the result." *Hass v. Port of Portland*, 112 Or App 308, 314, 829 P2d 1008, *rev den* 314 Or 391 (1992). Although we have not amplified the contours of the "some likelihood" inquiry, consigning it to case-by-case application, it is at least settled that "likelihood" does not mean probability; that is, we need not be persuaded that the result at trial *would* have been different but for the evidentiary error. *Id. See, e.g., Dyer v. R. E. Christiansen Trucking, Inc.*, 118 Or App 320, 325, 848 P2d 104 (1993) (evidentiary error was not harmless where "the result of the trial might have been different" if the erroneously admitted evidence had been excluded), *rev'd on other grounds* 318 Or 391, 868 P2d 1325 (1994). Perhaps the best approximation of our inquiry is that we view evidentiary error as reversible error—*i.e.*, as "substantially affecting the [appellant's] rights"—when, based on our assessment of the whole record, we believe that there was a substantial possibility that the error affected the result of the trial.

Applying that standard, we conclude that the erroneous exclusion of Gilmore's testimony pertaining to inadequate lighting requires reversal. As already noted, that testimony was highly probative with respect to two hotly contested issues of liability. Moreover, that testimony does not appear to have been substantially duplicative of other evidence before the jury. Accordingly, we reverse and remand for a new trial on the inadequate lighting specifications of plaintiff's negligence *per se* claim.

 Our disposition in that regard obviates the need to consider all but one of plaintiff's remaining assignments of error, the balance of which are either unlikely to reoccur on retrial or may arise, if at all, in a different context or posture.

However, to afford guidance on remand, we address, and reject, plaintiff's 16th assignment of error. That assignment challenges the trial court's exclusion of plaintiff's exhibit 77, a demonstrative computer animation, which purports to depict the accident scene and plaintiff's theories of how the accident itself occurred.[22] We understand the trial court to have excluded that evidence as being potentially misleading. Trial courts exercise broad discretion with respect to such evidence, *see James v. Carnation Co.*, 278 Or 65, 81, 562 P2d 1192 (1977), and the court's ruling here was within the permissible range of discretion.

Reversed and remanded for new trial on inadequate lighting specifications of plaintiff's negligence *per se* claim; otherwise affirmed.

---

[22] The animation showed two scenarios in which a human figure fell from what resembled the sample room roof—first, after hitting his head on an overhead pipe and becoming disoriented and, second, after tripping over a conduit. Plaintiff himself has no memory of the fall, and no one was present to witness it.