Argued and submitted April 3, appeal dismissed as moot; reversed and remanded for entry of judgment on cross-appeal October 9, 2002

Marilu E. BOOTHBY,
Personal Representative of
the Estate of Winston Boothby, Deceased,
for the benefit of Marilu E. Boothby, surviving spouse;
Marilu E. Boothby,
guardian ad litem for
Brett M. Boothby, a minor;
Cheryl M. Davis, a minor;
Shayne N. Davis, a minor;
and Rodney R. Davis, Jr., a minor,
children of decedent;
Michael T. Boothby and Gloria Negron,
surviving parents of decedent,
*Appellant - Cross-Respondent,*

*v.*

D.R. JOHNSON LUMBER CO.,
an Oregon corporation,
*Respondent - Cross-Appellant,*

*and*

RHINE EQUIPMENT COMPANY
and Barko Hydraulics, L.L.C.,
fka Barko Hydraulics, Inc.,
fka Barko Hydraulics,
*Defendants.*

9812-09070; A110786

55 P3d 1113

Meagan A. Flynn argued the cause for appellant - cross-respondent Marilu E. Boothby. With her on the briefs was Preston Bunnell & Stone, LLP.

Peter R. Chamberlain argued the cause for respondent - cross-appellant D.R. Johnson Lumber Co. With him on the briefs was Bodyfelt Mount Stroup & Chamberlain.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

BREWER, J.

**BREWER, J.**

Winston Boothby was crushed to death under a log loader. Plaintiff, individually and as the personal representative of Boothby's estate, alleged claims against defendant D.R. Johnson Lumber Co. (Johnson Lumber) for common-law negligence and for violations of the Employer Liability Act (ELA), ORS 654.305 to 654.336, and the Oregon Safe Employment Act (OSEA), ORS 654.001 to 654.295 and related statutes.[1] The jury returned a verdict in plaintiff's favor against Johnson Lumber on plaintiff's common-law negligence and ELA-based claims, awarding economic damages of $900,000 and noneconomic damages of $3,125,000. Pursuant to ORS 18.560, the trial court reduced the noneconomic damages to $500,000. It then reduced the total of the economic and noneconomic damages by Boothby's percentage of comparative fault as found by the jury and entered judgment for plaintiff in the amount of $938,000 plus costs. Plaintiff appeals, and defendant cross-appeals. We reverse on defendant's cross-appeal and therefore do not reach plaintiff's assignments of error on appeal.[2]

We take the undisputed facts from the record. Johnson Lumber entered into a contract with the State of Washington Department of Natural Resources to purchase, cut, and remove timber from certain state-owned land. Johnson Lumber then contracted with Intermountain Forest Management (Intermountain) to perform the logging work. At the time of his death, Boothby was working as a member of an Intermountain logging crew.

On April 2, 1998, Boothby and other employees of Intermountain were transported by a crew bus to the work site in the State of Washington. At the end of Boothby's approximately eight-hour work shift, Boothby and a coworker, Lanny Hatt, began walking down a road to the

---

[1] Relevant statutory provisions are set out in the discussion below.

[2] Plaintiff also brought negligence and product liability claims against the manufacturer of the log loader and a negligence claim against the local representative of the manufacturer, which provided maintenance for the machine. Plaintiff's claims against those two defendants were dismissed before trial.

crew bus. Boothby was carrying a chain saw, a lunch sack, and several other items.

Partway down the road, Boothby and Hatt encountered a log loader moving logs from one side of the road to the other. The two men waited until Hatt got the attention of the operator, who then put the machine in idle and signaled for them to pass. Hatt walked past the loader, then noticed that Boothby was not with him. He looked back and saw that Boothby was still in the position where the two men had stopped, but was now down on one knee. Hatt called to Boothby, who signaled that he should go ahead. Hatt again resumed walking down the road, then realized that the loader had begun backing toward Boothby, who was still down on his knee. He yelled at Boothby, who looked up, then seemed to "freeze." Jack Pitman, the site foreman, also saw the loader moving toward Boothby. He saw Boothby start to pick up the chain saw and yelled at him to leave the saw and get out of the way. He then saw Boothby turn toward the loader and seem to pause. Hatt and Pitman attempted to get the loader operator's attention, but were unable to do so. The loader continued backing up. As Boothby started to stand up, the loader caught his ankle, then backed over him, causing fatal injuries.

As noted, plaintiff alleged claims against Johnson Lumber for common-law negligence and violations of the ELA and the OSEA. The jury returned a verdict in plaintiff's favor on her common-law negligence and ELA-based claims. After reducing the damages under ORS 18.560(1) and by the percentage of Boothby's comparative fault as found by the jury, the trial court entered judgment for plaintiff in the amount of $938,000 plus costs.

On appeal, plaintiff asserts that the trial court erred in applying the $500,000 noneconomic damages limitation provided in ORS 18.560(1) and, alternatively, in applying that limitation before, rather than after, reducing the amount of damages to reflect Boothby's comparative fault. Johnson Lumber cross-appeals, arguing that the trial court erred in denying its motions for directed verdict on plaintiff's common-law negligence and ELA-based claims; in failing to give its requested instruction regarding its liability for the

torts of independent contractors—here, Boothby's employer Intermountain; in excluding evidence of Boothby's marijuana use and expert testimony regarding the effects of that use; in admitting evidence of Boothby's so-called "freeze response" at the time of the accident; in admitting opinion testimony regarding defendant's legal duty to inspect Boothby's employer's logging equipment and regarding defendant's compliance with safety laws relating to the log loader that killed Boothby; and in granting plaintiff's motion for partial directed verdict as to the contributory negligence of the manufacturer of the log loader.

If our disposition of one or more of Johnson Lumber's assignments of error on cross-appeal requires reversal of the trial court's judgment in its entirety, we need not reach plaintiff's assignments of error on appeal. We therefore begin with the former.

■■ In its first assignment of error, Johnson Lumber argues that the trial court erred in denying its motion for directed verdict on plaintiff's ELA claim. ORS 654.305 provides:

> "Generally, all owners, contractors or subcontractors and other persons having charge of, or responsibility for, any work involving a risk or danger to the employees or the public shall use every device, care and precaution that is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices."

As this court explained in *Woodbury v. CH2M Hill, Inc.*, 173 Or App 171, 21 P3d 153, *rev allowed*, 333 Or 73 (2001), the ELA imposes a heightened standard of care on employers and others who are "in charge of work involving 'risk or danger.'" *Id.* at 176 (citing and quoting *Miller v. Georgia Pacific Corp.*, 294 Or 750, 753, 662 P2d 718 (1983)). The ELA applies not only to direct employers but also to "indirect" employers. Indirect employer liability is triggered if any of three conditions is satisfied: (1) the plaintiff's direct employer and the defendant are engaged in a "common enterprise"; (2) the defendant retained the right to control the manner or method

in which the risk-producing activity was performed; or (3) the defendant actually controlled the manner or method in which the risk-producing activity was performed. *Id.* at 177 (citing *Wilson v. P.G.E. Company*, 252 Or 385, 390-92, 448 P2d 562 (1968); *Brown v. Boise-Cascade Corp.*, 150 Or App 391, 396, 946 P2d 324 (1997), *rev den*, 327 Or 317 (1998)).

■ ■ In determining whether the trial court correctly denied Johnson Lumber's motion for directed verdict on plaintiff's ELA-based claim, we examine the evidence and all inferences that can be drawn from it in the light most favorable to plaintiff, the nonmoving party. If there is some evidence to support each element of plaintiff's claim, a directed verdict properly was denied. *Brown*, 150 Or App at 395 n 4 (citing *Hickey v. Settlemier*, 141 Or App 103, 108, 917 P2d 44, *rev den*, 323 Or 690 (1996)); *see also Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984) (reviewing court will not set aside a jury's verdict in the plaintiff's favor unless it can affirmatively say that there is no evidence from which the jury could have found the facts necessary to establish the elements of the plaintiff's claim). We begin by considering whether there was evidence to demonstrate that Johnson Lumber was subject, in the first instance, to ELA-based negligence liability for Boothby's death.

In this court, Johnson Lumber argues that it is not subject to ELA-based liability for Boothby's death and therefore was entitled to a directed verdict on that claim, because there was no evidence from which the jury could find that it actually controlled the work that created the risk of danger to Boothby, that it retained the right to control that work, or that it was engaged in a common enterprise with Boothby's employer Intermountain. Johnson Lumber notes that plaintiff conceded that it did not actually control the work that created the risk of danger. In addition, it argues that the agreement between it and Intermountain did not provide for it to retain any right to control Intermountain's operations or employees. As to evidence of a common enterprise, Johnson Lumber argues that there was no evidence that any of Johnson Lumber's employees was involved in Intermountain's logging operation or that any Intermountain employee received instructions from Johnson Lumber or used Johnson Lumber equipment.

Plaintiff responds that Johnson Lumber was subject to the ELA under the "retained control" test because, according to plaintiff, Johnson Lumber's contract with the State of Washington provided that it would follow all applicable laws, be responsible for all work and equipment, and not delegate those duties. It also asserts that Johnson Lumber retained a right of control by reason of its contract with Intermountain, which permitted Johnson Lumber to declare Intermountain in breach if the latter did not comply with requirements relating to safety and to the manner of performing the logging work. Plaintiff asserts that Johnson Lumber also is subject to the ELA under the common enterprise test because there is evidence from which the jury could have found that the logging project "amounted to cooperative conduct" between Johnson Lumber and Intermountain—specifically, that Johnson Lumber's involvement amounted to "supervision"—and because Johnson Lumber assumed responsibility for safety at the logging site under its contract with the State of Washington. Plaintiff argues that Johnson Lumber violated the ELA by failing to comply with the requirement in ORS 654.305 that it use "every device, care and precaution which it is practicable to use" in regard to the operation of the log loader.

Johnson Lumber replies that its contract with the State of Washington is, in effect, irrelevant to the issues whether it retained any right of control over the logging site or was engaged in a common enterprise with Intermountain and that its contract with Intermountain unambiguously provides that the conduct and control of the logging work lay solely with Intermountain.

As Johnson Lumber notes, plaintiff does not argue that Johnson Lumber actually controlled the manner or method in which the risk-producing activity was performed. We therefore first consider whether there is evidence from which the jury could find that Johnson Lumber retained a right to control the manner or method of performing the risk-producing activity at issue in this case. In examining the record for that purpose, we look particularly at the nature of the control retained, if any. *See Wilson*, 252 Or at 395 (differentiating between, for example, control over the maintenance of insurance and control over safety procedures). The retained

right must "bear some relation to the creation of a risk of danger to [workers]." *Id.* at 395-96. "Where the provisions of a contract are undisputed and the question is whether the right to control retained thereunder * * * is sufficient to bring [a contracting party] within the purview of the ELA, the question is one of law for the court." *Id.* at 395.

■ As an initial matter, we agree with plaintiff that the risk-producing activity at issue here is operation of the log loader. *See Woodbury*, 173 Or App at 181 (for the purpose of an ELA analysis, the risk-producing activity is the "discrete activity" that caused the injury, such as moving boards from one place to another).

The contract between Johnson Lumber and Intermountain provided, in part:

"4. In consideration of [Johnson Lumber's] promise to compensate [Intermountain] as set forth herein, [Intermountain] agrees to perform *all of the on-site requirements set forth in the terms of the Timber Sale Contract which pertains [sic] to logging,* slash disposal, road building, reseeding, and other on-site activities, except that the following requirement shall be performed by [Johnson Lumber]: Road Rocking only.

"* * * * *

"6. CONDUCT OF LOGGING: All contract requirements will be completed and accepted in subdivisions or units prior to operating in other areas.

"In addition to the requirements set forth in the Timber Sale Contract, [Intermountain] agrees to perform the following:

"[Intermountain] shall provide *all labor, equipment, materials and other resources necessary to the performance of its obligations* under this Contract. [Johnson Lumber] shall not be obligated to provide any equipment, materials, labor, or other resources (except a[s] noted in Section 4 of this agreement.)

"* * * * *

"9. RELATIONSHIP: The parties understand, agree, and declare that the relationship between [Johnson Lumber] and [Intermountain] is that of Purchaser and Contractor. [Johnson Lumber] is interested only in the results to be

achieved and, except for the timing of operations, *the conduct and control of the work will lie solely with [Intermountain.]* * * *

"10. CONTROL OF OPERATIONS: [Johnson Lumber] shall have the right, at its option, to control the timing of [Intermountain's] performance hereunder, including but not limited to determination of the starting date, sequence of units to be logged or roads to be built, suspension periods, and completion date. [Intermountain], at [Intermountain's] expense, *shall be solely responsible for providing and maintaining all supplies and equipment, safety,* fire prevention and protection, *technique,* and operations shall be conducted with due care and in a workmanlike manner consistent with the highest standard in the trade and [Intermountain] shall refrain employees or agents during said operations. [Intermountain] shall be responsible for the conduct and omissions of its employees, agents, subcontractors and assistants and their employees or agents and [Intermountain] shall abide by all applicable laws and regulations pertaining to said operation."

(Emphasis added.) By their terms, Sections 4, 6, and 9 demonstrate, respectively, that Intermountain agreed to perform all on-site "requirements" pertaining to logging, that it was required to provide all labor, equipment, and other "resources" necessary for performance of that work, and that the "conduct and control" of the work lay "solely with" Intermountain. In addition, by its terms, Section 10 provides that Intermountain "shall be solely responsible for providing and maintaining all * * * equipment, safety * * * and * * * technique." Those provisions are not only broadly worded but also unambiguous: they provide that Intermountain assumed any and all "right" to control the risk-producing activity at issue here—again, the operation of the log loader—and that, conversely, Johnson Lumber retained no right of control as to that activity.

As discussed above, in asserting that Johnson Lumber retained some right of control over the operation of the log loader, plaintiff relies, in part, on Johnson Lumber's timber sale contract with the State of Washington.[3] Johnson Lumber, in turn, urges that that document is not relevant.

---

[3] Plaintiff relies on the following portions of Johnson Lumber's contract with the State of Washington:

■ We need not decide, however, whether the timber sale contract between Johnson Lumber and the State of Washington is relevant to the question of Johnson Lumber's retained right of control over Intermountain's performance of the risk-producing activity in this case. Even assuming that it is, nothing in that contract—including the provisions relied on by plaintiff—properly can be construed to create or maintain a retained right of control in Johnson Lumber. Rather, although the timber sale contract provides that "[a]ll work, equipment, and materials necessary to perform" the contract are Johnson Lumber's responsibility and requires that Johnson Lumber comply with all applicable laws, the contract expressly permits Johnson Lumber to delegate the performance of the contract, albeit without thereby relieving itself of the duty to perform. As discussed above, in its contract with Intermountain, Johnson Lumber unambiguously delegated the performance of the logging to that entity.

---

"G-120 Responsibility for Work

"All work, equipment, and materials necessary to perform this contract shall be the responsibility of Purchaser. Any damage to improvements, except as provided in clause G-130 or unless the State issues an operating release pursuant to clause G-280, shall be repaired promptly to the satisfaction of the State and at the Purchaser's expense.

"* * * * *

"G-170 Assignment and Delegation

"No rights or interest in this contract shall be assigned by Purchaser without prior written permission of the State. Any attempted assignment shall be void and ineffective for all purposes unless made in conformity with this paragraph. Purchaser may perform any duty through a delegate, but Purchaser is not thereby relieved of any duty to perform or any liability. Any assignee or delegate shall be bound by the terms of the contract in the same manner as the Purchaser.

"* * * * *

"G-250 Compliance with all Laws

"Purchaser shall comply with all applicable statutes, regulations and laws, including, but not limited to, the applicable requirements of WAC 240-15-015 (relating to prohibitions on export and substitution), WAC 240-15-025 (relating to reporting requirements), and WAC 240-15-030 (relating to enforcement)."

In addition, plaintiff relies on Section H of the contract, setting out specific requirements relating to "Harvesting Operations," including dates for performance of specified operations and requirements relating to branding and painting, skid trail location, snags, stump height, and other areas of operation.

Johnson Lumber is not subject to the ELA by reason of a retained right of control. *See Wienke v. Ochoco Lumber Co.*, 276 Or 1159, 558 P2d 319 (1976) (ORS 654.305 requires "a certain kind of relationship between" the plaintiff's decedent and the defendant, which is ordinarily stated in terms of a defendant's control—retained or actual—over the risk-causing work; a contract between the defendant and a labor union, requiring the defendant to require its subcontractors to maintain specified working conditions, permitted the defendant a right of control over the contractor, but not over the working conditions themselves, which were controlled by the decedent's direct employer; rejecting argument that "one who assumes the duty of control should not be allowed to pass that duty to others").

 We next consider whether Johnson Lumber was subject to ELA liability under the common enterprise test. That test requires that the defendant employer participate in a project with the injured person's employer, that the defendant employer's operations constitute an "integral" or "component part" of the project, and that the defendant employer have "charge of or responsibility for the activity or instrumentality that causes the [injured person's] injury." *Sacher v. Bohemia, Inc.*, 302 Or 477, 486-87, 731 P2d 434 (1987) (citations, internal quotations omitted). In addition, there must be a causal link between the defendant employer's involvement in the joint work and the person's injury. *Brown*, 150 Or App at 396-97 (citing, among other cases, *Sacher*, 302 Or at 485).

Various witnesses testified at trial regarding Johnson Lumber's participation in the logging project generally and its practical responsibility, if any, for the operation of the log loader. Intermountain owner Gary Briggs testified that he had been in the logging business for 40 years and that Intermountain was a contract logging firm that had been in business since 1994. He testified that he had attended a pre-work conference regarding the logging project at issue here and that, generally in such a conference, the agency contract administrator explains what the agency wants done and the logging contractor—here, Intermountain—explains "what [its] procedure is going to be," including "the number of men and the equipment that's going to be used." Briggs testified

that, although "the sheet" named Johnson Lumber employee Tom Varley as the "Designated Representative" on the site, he understood that he, Gary Briggs, was in fact the designated representative who would "deal with the [Washington] Department of Natural Resources on a daily basis" and that that procedure was an "industry-wide accepted procedure."[4] He testified that, on the work site at issue, Intermountain had built roads, had felled, bucked, yarded, and loaded the timber, and had completed "slash abatement." He testified that, although Varley had come out to the site approximately once a month and "observed" the operation, Johnson Lumber had never told Intermountain how to do its work or inspected its equipment or "check[ed] upon" its training procedures.

Intermountain employee Pitman was the "working foreman" at the job site where Boothby was killed and was the liaison between Gary Briggs and the logging crew. Pitman testified that Johnson Lumber had no equipment on the job site except for "ticket books for the log notes"; that he had had no contact with Johnson Lumber on the job site; and that Johnson Lumber had never told him how to do his job. Pitman testified that Intermountain held safety meetings each month and when changing job sites, that he kept a record of the meetings, and that the meetings included information about keeping clear of equipment. He also testified that he had spoken "a few times" specifically with Boothby about "safety concerns," including warning him about being in "bad spots." Pitman testified that, during his approximately 14 years as a logger, he had never seen a timber purchaser inspect logging equipment or "watch" to see that a job was "done safely."

Intermountain's employee Tim Hatt (Lanny Hatt's brother) testified that he had worked in the logging industry for 14 years, that he previously had had his own logging company, and that, at the time of Boothby's death, his job at the

---

[4] Briggs did not explain what document comprised "the sheet." The record includes a State of Washington, Department of Natural Resources, "LOGGING PLAN AND ADVICE OF OPERATIONS" for the project at issue here, on which Johnson Lumber is listed as "Purchaser," Gary Briggs is listed as "Operator," and Varley is listed as "Designated Representative." The document does not describe any actual functions of the designated representative. The document is signed by the state's contract administrator as well as by Varley and Gary Briggs.

work site was to supervise other employees working as choker setters. He testified that, while working for Intermountain, he understood that Gary Briggs was his "boss" and that no one from Johnson Lumber had ever come to the site and told him "what to do." Hatt testified that Intermountain had safety meetings at least once a month and also every time it hired a new employee; he also had personally discussed various safety issues with Boothby.

Steve Briggs, who was Gary Briggs' nephew and the operator of the log loader that caused Boothby's death, testified that he had never seen timber purchasers inspect a logging contractor's equipment for compliance with safety standards and that, in relation to this job, had never been told by anyone from Johnson Lumber how to operate the log loader or "do [his] job." He also testified, however, that he had never attended any safety meetings at Intermountain and had never seen, signed, or been asked to sign any safety logs. Briggs testified that he had "warned" Boothby about safety issues and that, because he had felt that Boothby was "very unsafe" and "didn't pay attention very well," he had discussed Boothby's "employment" with Gary Briggs.

Lanny Hatt, who had worked at the job site for approximately three days before Boothby was killed and who, as described above, had been walking with Boothby just before the accident, testified that Johnson Lumber had not required him to attend any "mandatory safety meetings."

Douglas Ansotegui was a subcontractor for Intermountain who processed logs at the job site where Boothby was killed. He testified that he had worked in the logging industry for approximately 17 years and that he had never observed timber purchasers inspecting a logging contractor's equipment for compliance with safety regulations. Specifically in regard to the job site in this case, he testified that he understood Varley to be Johnson Lumber's "representative" at the site but that he did not know how often Varley "showed up" on the site; that he did not consider Varley to be "in charge of the operation"; and that no one from Johnson Lumber had ever come out to the site to inspect his equipment or tell him how to perform his job.

Michael Lulay, an employee of the "technical section" of "Oregon OSHA,"[5] testified that, as of the time of Boothby's death, there did not exist in Oregon "a standard or a custom in the [logging] industry" under which timber purchasers "monitor" a logging contractor's "training." Lulay explained that, before a logging project begins, the logger, the purchaser, and the state "will usually go to the landowner in a group" to try to arrange for amelioration of any dangerous conditions, "[b]ut when it comes to day-to-day personnel administration, no. Even [Oregon] law puts that directly on the employer. In this case, it would be Gary Briggs," Intermountain's owner. Lulay also testified that, when he worked for a timber purchaser in Washington, the same rule prevailed: "[T]hey didn't mess with the contractor's safety programs." Lulay testified that, if the accident that occurred in this case had occurred in Oregon, Gary Briggs would have received a citation but that "[Johnson Lumber] would not have been involved in that as far as Oregon OSHA is concerned."

Thomas Sturza testified as an expert witness for plaintiff. He was a former safety inspector, safety engineer, and timber falling "quality controller" for the State of Washington. He had also been a logging company owner for 15 years and a safety consultant for 10 years. Sturza testified that he had conducted an investigation at the scene of the accident in which Boothby was killed and had also reviewed the coroner's report and depositions of persons at the scene. Sturza testified that, in his view, there had been an "inadequate" safety program on the site where Boothby was killed, including inadequacies relating to workers' training, to the visibility of workers' clothing, to the condition of the log loader, and to the use of radios. He believed that "half the people at the job site had never attended a safety meeting." Sturza also testified that the State of Washington issued several citations relating to the accident, including citations for operation of the log loader while the operator was facing in the opposite direction, without sounding an alarm, and without adequate "machine clearance warning markings"; for

_____

[5] "Oregon OSHA" is the Occupational Safety and Health Division of the Oregon Department of Business and Consumer Services. *See* ORS chapter 654; OAR chapter 437.

failure to supply high-visibility hard hats and clothing to workers; and for failure to provide a "workable safety accident prevention program." No citations, however, were issued to Johnson Lumber.

Sturza testified that there was a "standard of care" in "the industry" that a worker "will not move any kind of a piece of equipment until you know that the area is clear of any personnel." He also testified that, in his opinion, "The duties of a timber purchaser or a general contractor in the [S]tate of Washington, such as in all other states, it's for the general contractor or the purchaser to be in charge of all the safety of all workers on the job site" and that, in this case, it was Johnson Lumber's "responsibility beginning with the safety program to make sure" that the log loader was inspected "every day."[6] Sturza testified that timber purchasers who contract with his logging company check his logging company's equipment and "ma[k]e sure it is operating well." When asked whether he had an opinion as to whether Johnson Lumber "provided every device, care, and precaution which was practical to use at this job for the protection and safety of life and limb," he replied, "I don't think that much was done for safety in this whole situation."

Finally, Varley testified that he had worked at Johnson Lumber for almost 10 years and that it was his responsibility as a timer manager to "make sure that we get enough timber to * * * keep the mills operating." He testified that Johnson Lumber had previously had its own logging crews but that it had shut down its logging operations in late 1994 or early 1995. He testified that, although he was named in the contract between Johnson Lumber and Intermountain as "designated representative" on the logging project, he had "verbally" designated Gary Briggs as representative and that the Washington Department of Natural Resources had never objected to that designation. When asked whether he had

---

[6] On cross-examination, Sturza testified that it was "standard" in "governmental agenc[ies]" to refer to a timber purchaser as a "general contractor." Lulay, Pitman, Steve Briggs, and Ansotegui each testified that he had never heard timber purchasers referred to as "general contractors" on a logging project.

inspected the quality of Intermountain's equipment, Varley testified that he had not done so.

We conclude that none of the described evidence, or any other evidence in the record, supports a finding that Johnson Lumber, or any of its employees, was an integral participant in the logging project or that Johnson Lumber was responsible for the safe operation of the log loader. Although there is evidence that Johnson Lumber's representative Varley was nominally the "designated representative" for the project and that he was present at the site on occasion, there also was evidence that he had delegated his representational duties to Gary Briggs, that Gary Briggs understood that he was the acting designated representative, and that neither Varley nor any other Johnson Lumber employee had ever inspected any of the equipment at the site, instructed any Intermountain employees how to do their jobs, conducted any operations at the site, or had been in any manner "in charge of" the site or the project. More specifically, the record lacks evidence that Varley or any other Johnson Lumber employee was ever involved in the operation of the log loader, that it had ever given any Intermountain employee any instructions or directions regarding the operation of the loader, or even that it had ever involved itself in safety issues generally at the site. Conversely, there is evidence that Intermountain's owner, Gary Briggs, spoke to Boothby about safety issues and that, when Intermountain employees (including Pitman, Hatt, and Steve Briggs) were concerned about Boothby's safety, they spoke to Boothby themselves or to Gary Briggs. Finally, Sturza testified that, in his opinion, the duties of a timber purchaser include "be[ing] in charge of all the safety of all workers on the job site" and that timber purchasers for whom his logging company had performed logging operations checked his logging equipment. However, he did not testify that, at this site, Johnson Lumber in fact generally exercised "charge" of safety training or programs, inspected Intermountain's equipment, or otherwise participated in the project. In short, the record lacks evidence that Johnson Lumber was responsible for the safe operation of Intermountain's log loader.[7]

---

[7] Because we conclude that Johnson Lumber had no responsibility for the operation of the log loader, we need not consider whether it exercised that responsibility in such a manner as to form a nexus between that exercise and Boothby's death.

As noted, plaintiff points to Johnson Lumber's purported "supervisory" role over the project and its purported ultimate responsibility for the project under its contract with the State of Washington. As a matter of law, however—and in light of the complete lack of evidence in the record showing that Johnson Lumber was an integral participant in the logging project or that it had charge over or responsibility for the activity or instrumentality that caused Boothby's death—that is not enough. The evidence does not support a verdict in plaintiff's favor based on a "common enterprise" theory of ELA liability.

In summary, Johnson Lumber did not retain a right of control over the operation of the log loader. In addition, it did not engage in a common enterprise by exercising control or charge over the log loader's operation. Again, plaintiff does not allege that Johnson Lumber exercised actual control over the operation of the log loader. Because Johnson Lumber did not meet any of the tests for application of the ELA, the trial court erred in denying Johnson Lumber's motion for directed verdict on the ELA-based negligence claim.

We turn to Johnson Lumber's second assignment of error on cross-appeal, in which it argues that the trial court erred as a matter of law in denying its motion for a directed verdict on plaintiff's common-law negligence claim.[8] Specifically, Johnson Lumber argues that, under *Brown* and related cases, an owner who hires an independent contractor is not liable in negligence to employees of the independent contractor for injuries or death resulting from hazards normally attendant on work for which the independent contractor was hired and for which the owner has no responsibility or involvement. Johnson Lumber asserts that, here, Intermountain was its independent contractor and was responsible for the control and conduct of its employees and for determining

---

[8] In her negligence claim, plaintiff alleged that Johnson Lumber was negligent in various respects relating to the operation of the log loader, including by failing to inspect it before its use and by allowing it to be driven when it knew, should have known, or recklessly disregarded that the back-up alarm and horn were not working, that the driver's vision was obstructed, that there was no spotter, and that the loader's condition violated safety statutes and regulations. She also alleged that Johnson Lumber was negligent in failing to report equipment in need of repair, in failing to provide a safety program or protective clothing, and in failing to comply with various State of Washington safety standards for logging operations.

how to perform the requirements of the work, which required Intermountain's "specialized knowledge and training."

Plaintiff responds that Johnson Lumber is relying on a "no duty" principle enunciated in cases preceding the Supreme Court's decision in *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987), and that, even assuming that the principle "survives" the latter case, it applies only when a defendant has no knowledge of the independent contractor's area of expertise and that Johnson Lumber had knowledge and expertise of logging. Plaintiff also argues that Johnson Lumber had an "independent source of obligation" to protect Boothby's safety, namely, Johnson Lumber's agreement with the State of Washington providing, in part, that it would be responsible for "[a]ll work, equipment and materials." Johnson Lumber replies, in part, that plaintiff's reasoning cannot be correct because, if it were, a contracting party would be entitled to avail itself of the independent contractor defense only if it were entirely ignorant of the type of work for which the independent contractor was hired.

As in regard to plaintiff's ELA-based negligence claim, in determining whether the trial court correctly denied Johnson Lumber's motion for directed verdict on plaintiff's common-law negligence claim, we review the record and all inferences that can be drawn from it in the light most favorable to plaintiff, to determine whether there is some evidence by which the jury could have found each of the necessary elements of that claim. *Brown*, 150 Or App at 395 n 4. Also as in regard to plaintiff's ELA-based negligence claim, we begin by considering whether there was any evidence demonstrating that Johnson Lumber was subject, in the first instance, to liability for common-law negligence in regard to Boothby's death.

In *Yowell v. General Tire & Rubber*, 260 Or 319, 325, 490 P2d 145 (1971), the defendant hired the plaintiff's employer to repair a sign. The employer sent the plaintiff to do the repair work. After the plaintiff was injured, he brought an action for negligence, alleging that he was on the defendant's premises as an "invitee" to whom the defendant owed

a duty to exercise reasonable care to provide a safe workplace.

The trial court granted the defendant's motion for an involuntary nonsuit, and the Supreme Court affirmed. It explained that a person who orders repairs or work to be done by a third party "owes no duty" to the third party or its workers to "discover and warn of any unknown dangerous conditions surrounding the work" that fall within the "special expertise or knowledge" of the third party, not shown to be possessed by the person ordering the work and which the third party impliedly represents to the public that it possesses. *Id.* at 325; *see also Esko v. Lovvold,* 272 Or 27, 30-31, 534 P2d 510 (1975) (after the plaintiff, a cablevision lineworker, was injured installing cable on a utility pole on the defendant's property, the plaintiff brought a negligence action against the defendant; court held that the trial court correctly granted the defendant's motion for directed verdict because the plaintiff's employer had held itself out to the public as having proficiency in the task at issue and the defendants were not shown to have any special expertise or familiarity in that regard).[9]

The principle was applied with the same result in *George v. Myers,* 169 Or App 472, 10 P3d 265 (2000), *rev den,*

---

[9] The *Yowell* court explained that it preferred to state the principle in terms of the property owner or contractor owing no duty, rather than in terms of the subcontractor or its employees assuming the risk. 260 Or at 325-26. As previously stated, plaintiff questions whether the "no duty" principle of *Yowell* and *Esko* "survives" the "foreseeability" analysis set out in *Fazzolari,* in which the Supreme Court held that, unless the parties in a negligence action

"invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from [the] defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

*Fazzolari,* 303 Or at 17. In *George v. Myers,* 169 Or App 472, 487 n 13, 10 P3d 265 (2000), *rev den,* 331 Or 692 (2001), we noted that, "[r]ecast in post-*Fazzolari* terms, *Yowell*'s rule is that the relationship between a contractor and a specialized subcontractor embodies a special 'status' or 'relationship,' taking precedence over application of ordinary principles of general foreseeability." *See also Fortney v. Crawford Door Sales Corp.,* 97 Or App 276, 280, 775 P2d 910 (1989) (citing *Fuhrer v. Gearhart By The Sea, Inc.,* 306 Or 434, 760 P2d 874 (1988)) ("although *Fazzolari* has changed the role of duty in negligence law, it has not eliminated the rule that a defendant must have *some* responsible involvement with an event in order to be found negligent for its occurrence").

331 Or 692 (2001). In that case, while working for his employer, a framing subcontractor, the plaintiff fell from the third story of the defendant general contractor's house. 169 Or App at 474-75. Among other claims, the plaintiff brought a common-law negligence claim, which the trial court dismissed on the ground that the defendant had no duty to the plaintiff under premises liability principles. *Id.* at 485-86. On the plaintiff's appeal of the dismissal, he asserted that, by virtue of the defendant's status as a general contractor as well as the owner of the property, the defendant should have foreseen the risk to the plaintiff. The plaintiff also asserted that the defendant should be liable in negligence because the risk or defect was "obvious." *Id.* at 486.

We first concluded that, under *Yowell*, any distinction between a landowner and a contractor was irrelevant. *George*, 169 Or App at 486-87. We also concluded that, even though a particular risk to a plaintiff is obvious, a defendant is entitled to rely on the plaintiff's (or the plaintiff's employer's) "special expertise or knowledge," *id.* at 487, with respect to a particular task that causes a plaintiff's injury and that there was evidence in that case that the defendant had contracted with the framing subcontractor because of its experience and specialized expertise in framing. Conversely, the court determined that there was no evidence that the defendant had any knowledge or expertise "regarding appropriate fall protection in framing * * * houses." *Id.* at 488. We concluded that "*Yowell*'s fundamental principle precludes liability in this case" and affirmed the trial court's dismissal of the claim. *George*, 169 Or App at 488.

In *Brown*, the plaintiff, an employee of an industrial painting contractor, was injured while painting the defendant's mill. 150 Or App at 393-94. In his ensuing action against the defendant, he alleged that the latter was negligent by reason of failing to take specified safety measures. The trial court struck all but one of the plaintiff's negligence-related specifications, and the defendant was found to be negligent *per se* on that specification. The plaintiff appealed, and the defendant cross-assigned error to the trial court's failure to direct a verdict against the plaintiff's entire negligence claim. On appeal, we agreed that the defendant was entitled to a directed verdict. We explained that "the advisability and

efficacy" of the safety measures identified by the plaintiff "was a matter peculiarly within [the plaintiff's employer's] 'special expertise or knowledge.' [Employer], not defendant, was the expert in painting and painter safety." *Id.* at 399-401; *see also Fortney*, 97 Or App at 280 (citing *Fuhrer*) (in order for a nonemployer defendant to be held liable in negligence for the plaintiff's injuries, the plaintiff must demonstrate that the defendant has some responsibility for "the event" that caused those injuries).

██ Here, Johnson Lumber contracted with Intermountain to log the timber Johnson Lumber had purchased from the State of Washington. As previously discussed in regard to a "retained right of control" theory of ELA-based negligence liability, under that contract, Intermountain assumed responsibility for performance of the logging operations, including agreeing to "perform all of the on-site requirements" set out in Johnson Lumber's contract with the State of Washington and agreeing to "be solely responsible for providing and maintaining all * * * equipment, safety [and] technique"; the contract also provided that the "conduct and control of the work will lie solely with Intermountain." Under those provisions, Johnson Lumber had bargained for, and was entitled to rely on, Intermountain's exercise of its own specialized knowledge and expertise in the performance of logging operations, including the implementation of appropriate safety measures for the conduct of those operations. *See George*, 169 Or App at 487, 487 n 11 (where the risk presented in that case was "inextricably intertwined" with the "specialized task" that the defendant had hired the plaintiff's employer to perform, and where the court had determined in regard to the plaintiff's ELA claim that the defendant had neither retained nor exercised control over the performance of the task, the court concluded that the defendant also had "no duty" for purposes of the plaintiff's common-law negligence claim).

The testimony of plaintiff's expert witness, Sturza, does not compel a different conclusion. As discussed above, Sturza testified that safety measures at the site where Boothby was killed were inadequate; that, in principle, timber purchasers remain responsible for worker safety on logging projects, including inspection of equipment; and that,

when his own logging company conducted logging operations, timber purchasers checked his company's equipment. Again, however, evidence in the record shows that Johnson Lumber contracted with Intermountain for the latter to perform the logging operation, including the performance of any necessary safety measures; that Intermountain in fact performed those functions; and that Johnson Lumber did not do so. Sturza's testimony regarding the purported responsibility, in the abstract, of timber purchasers for safety at logging sites, and Sturza's legal conclusions regarding the sufficiency of safety measures in this case, did not create a question of fact for the jury regarding Johnson Lumber's "duty" to discover and warn Intermountain's employees against unsafe or dangerous conditions at the job site.

Nor is it significant that, unlike the defendants in *Yowell*, *Esko*, *George*, or *Brown*—who apparently lacked "special expertise or knowledge" regarding the particular activities that caused the plaintiffs' injuries—Johnson Lumber had itself previously performed logging operations. The record shows that Johnson Lumber had ceased its logging operations by approximately 1994. Nor is there any evidence in the record showing that it currently had, or exercised, expertise in that area; more specifically, nothing in the record shows that it exercised such expertise at the logging site at issue here. We decline to hold that, to avoid liability, an indirect employer defendant must never previously have held or exercised specialized knowledge or expertise in the type of activity that caused a plaintiff's injury. *Cf. George*, 169 Or App at 487-88 (explaining that it would be "tautological" to preclude an indirect employer from relying on the plaintiff's direct employer's specialized expertise or knowledge merely because the indirect employer necessarily must have been aware of the hazard that it engaged the plaintiff's direct employer to remediate).

Finally, evidence in the record that Varley was the nominal designated representative for the project also lacks significance. Nothing in the document listing Varley as the designated representative states the purpose or scope of that designation. Moreover, plaintiff did not dispute that Gary Briggs was the actual "designated representative" at the site

and presented no evidence showing that Varley was involved in the actual performance of the logging operation. There also is no evidence in the record of any legal constraint—such as a prohibition in Johnson Lumber's contract with the State of Washington—on Varley's oral delegation of his duties as designated representative (whatever those might have been) to Gary Briggs. Indeed, the only evidence in the record on that point indicates that the State of Washington did not object to that redesignation. Accordingly, evidence regarding Varley's nominal status as the designated representative for the project is insufficient to create a jury question regarding Johnson Lumber's duty to Boothby.

In summary, the evidence shows that Johnson Lumber contracted with Intermountain to perform all aspects of the logging operation, including aspects related to safety. Stated another way, the evidence demonstrates that Johnson Lumber bargained for Intermountain's "special expertise and knowledge," *Yowell*, 260 Or at 325, regarding the logging of the timber. The evidence also shows that Intermountain actually carried out those responsibilities. Conversely, there is no evidence that Johnson Lumber was involved in the performance of the logging operation; in particular, the record lacks evidence showing that Johnson Lumber was involved in the particular event or activity that caused Boothby's death. The record also lacks evidence that Johnson Lumber in fact retained any expertise in or responsibility for the actual performance of the logging operation by reason of its contract with State of Washington, by reason of Johnson Lumber's previous performance of logging operations, by reason of Varley's status as designated representative, or for any other reason. Nor, on the record here, does testimony regarding abstract principles relating to timber purchasers' responsibility for logging safety suffice to create a fact question regarding Johnson Lumber's responsibility here. For all of those reasons, we conclude that there was no evidence from which a jury could find that Johnson Lumber owed a "duty" to Intermountain's employee, Boothby, so as to give rise to liability to plaintiff in negligence for Boothby's death. It follows that the trial court erred in denying Johnson Lumber's motion for a directed verdict against that claim.

Our disposition of Johnson Lumber's cross-appeal renders plaintiff's appeal moot.

Appeal dismissed as moot; on cross-appeal, reversed and remanded for entry of judgment for cross-appellant.